UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO C. SIMONELLI,<br><br>         Plaintiff,<br><br>    v.<br><br>UNIVERSITY OF CALIFORNIA - BERKELEY, ET AL.,<br><br>         Defendants.<br>_____/ | No. C 02-1107   JL<br><br>**ORDER DENYING SUMMARY JUDGMENT<br>(Docket # 156 )** |

**Introduction**

This Court has original jurisdiction pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), the Americans With Disabilities Act of 1990 ("ADA") (42 U.S.C. § 12101 et seq.). The Court has supplemental jurisdiction over claims under California law for violation of the Unruh Civil Rights Act (California Civil Code §§ 51, 52), (b). All parties consented to this Court's jurisdiction as provided by 28 U.S.C. §636(c) and Civil Local Rule 73. Plaintiff Antonio Simonelli filed a motion for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, which came on for hearing. Christopher W. Katzenbach, KATZENBACH & KHTIKIAN, appeared for Plaintiff. Marcie Isom, GORDON & REES, LLP, appeared for Defendants.

The Court considered the moving and opposing papers and the arguments of counsel and hereby denies the motion. Plaintiff fails to meet his burden to show that there is no genuine issue of material fact that the University violated its duty to accommodate

him, that the University's actions constitute "deliberate indifference" to Plaintiff's federally protected rights, and Plaintiff is entitled to lost salary due to the University's failure to accommodate him and the consequent delay of his graduation preventing him from obtaining employment as a lawyer. The case shall proceed to jury trial.

### Joint Statement of Undisputed Facts

1. Plaintiff Antonio Simonelli commenced law school at Boalt School of Law in Fall semester 2000 and graduated from Boalt in May 2005. Declaration of Antonio Simonelli In Support of Claim for Compensatory Damages filed December 2, 2005 (hereinafter "Simonelli Damages Decl.") at ¶¶ 4, 31.

2. Plaintiff is and was while a student at Boalt a person with a disability within the meaning of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 705(20)). Defendant the Regents of the University of California's Amended Response to Plaintiff's Requests For Admission, Set One dated April 5, 2007 ("UC's Amended Response to RFA") at Response to RFA No. 1 ("Admit").

3. Plaintiff is and was while a student at Boalt a person with a disability within the meaning of the Americans with Disabilities Act (42 U.S.C. § 12102(2)). UC's Amended Response to RFA at Response to RFA No. 2 ("Admit").

4. Plaintiff is and was while a student at Boalt a handicapped person within the meaning of the Federal Regulations issued under the Rehabilitation Act at 34 C.F.R. Part 104. UC's Amended Response to RFA at Response to RFA No. 3 ("Admit").

5. Plaintiff is and was while a student at Boalt a qualified individual with a disability within the meaning of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 705(2)), 794). UC's Amended Response to RFA at Response to RFA No. 4 ("Admit").

6. Plaintiff is and was while a student at Boalt a qualified individual with a disability within the meaning of section 101(8) of the Americans with Disabilities Act (42 U.S.C. § 12111(8)). UC's Amended Response to RFA at Response to RFA No. 5 ("Admit").

7. Plaintiff is and was while a student at Boalt a qualified handicapped person within

1  the meaning of the Federal Regulations issued under the Rehabilitation Act at 34 C.F.R.
2  Part 104. UC's Amended Response to RFA at Response to RFA No. 6 ("Admit").

3          8. Defendant the University of California Berkeley is and has been continuously
4  since at least August 2000 a recipient of Federal financial assistance within the meaning of
5  section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794). Defendant the Regents of
6  the University of California's Second Amended Response to Plaintiff's Requests For
7  Admission, Set One ("UC's Second Amended Response to RFA") at Response to RFA No.
8  7 ("Admit").

9          9. Defendant the University of California Berkeley is and has been continuously
10 since at least August 2000 a public entity within the meaning of section 201(1) of the
11 Americans with Disabilities Act (42 U.S.C. § 12131 (1)). UC's Second Amended Response
12 to RFA at Response to RFA No. 8 ("Admit").

13         10. Defendant the University of California Berkeley is subject to the federal
14 regulations issued by the Department of Education set forth in 34 C.F.R. Part 104. UC's
15 Second Amended Response to RFA at Response to RFA No. 9 ("Admit").

16         11. Defendant the University of California Berkeley is subject to the federal
17 regulations issued by the Department of Justice set forth in 28 C.F.R. Part 35. UC's Second
18 Amended Response to RFA at Response to RFA No. 10 ("Admit").

19         12. Exhibit 1 is a true and correct copy of the letter from the UC Berkeley ADA/504
20 Compliance Officer Ward Newmeyer to Christopher Katzenbach dated January 17, 2002.

21         13. Exhibit 2 is a true and correct copy of Plaintiff's Boalt School of Law transcript
22 dated September 17, 2002.

23         14. Defendants will not be asserting at trial any defense that Plaintiff's request for
24 large-print course materials resulted in a fundamental alteration of the law school program
25 or an undue financial or administrative burden. Letter from Isom to Katzenbach dated April
26 26, 2007.

27         15. Plaintiff obtained his Bachelor of Arts degree from the University of California,
28 Berkeley ("UCB") in May 2000. See Exhibit 2 to the Joint Statement.

16. Before Plaintiff's law school classes began, Plaintiff requested accommodations from the University of California, Berkeley. Deposition of Antonio C. Simonelli at p. 116-119.

17. Pursuant to Plaintiff's request, Newmeyer conducted an investigation. See Exhibit 1 to Parties' Joint Statement.

18. On March 24, 2004 Plaintiff was injured in an automobile accident and was unable to attend the remainder of his classes for the Spring 2004 semester. Simonelli Damages Decl. at ¶ 29.

19. Plaintiff took his Spring 2004 exams after the original exam date because of injuries he sustained in a car accident. Simonelli Damages Decl. at ¶ 29.

20. Plaintiff took his final examinations after the original exam date every semester until Spring 2003. Simonelli Damages Decl. at ¶6, 9, 14, 15, 22 and 23.

21. Plaintiff received all of his course materials on time and in the correct format from the spring 2003 semester on. Simonelli Damages Decl. at ¶25, 27 and 31. (Joint Statement of Undisputed Material Facts, filed by Antonio Simonelli on August 31, 2007, modified September 4, 2007; Docket #159)

Both sides also submitted separate statements of facts - Defendants' Separate Statement ("DSS") and Plaintiff's Separate Statement of Undisputed Material Facts ("SSUMF"). Both parties also responded to each other's separate statements.

## Procedural Background

Simonelli filed his complaint in March 2002 while he was a student at Boalt Hall School of Law of the University of California at Berkeley. Two months later he filed an application for a temporary restraining order ("TRO") and for a preliminary injunction. The district court (Hon. Charles R. Breyer) referred the parties for a settlement conference before a magistrate judge (Hon. Maria-Elena James). They were not able to resolve their dispute. Plaintiff renewed his motion for a TRO, the district court denied the motion and referred the parties back to the magistrate judge for a further settlement conference.

The parties continued settlement negotiations. By May 2003 they had reached an interim agreement. The magistrate judge issued a series of orders to both sides regarding compliance with the interim agreement.

In August 2003 Simonelli filed an application for a new TRO to permit him to participate for a second time in the interview process for summer law firm employment. The district court denied the application.

On August 24, 2004, Plaintiff advised the district court that

> "Magistrate Judge James has conducted settlement conferences with the parties. As a result of these conferences, the parties have reached a settlement as to accommodation of plaintiff's disability and a schedule for plaintiff to complete his law school studies. The parties will be conducting a further settlement conference with Judge James in October or November to resolve issues of damages and attorney fees."

The parties participated in a number of case management conferences and settlement conferences but advised the court on October 3, 2005 that they were unable to settle and the case should be set for trial or dispositive motions.

In January 2006 all parties consented to reassignment to this Court for all further proceedings. The case was scheduled for case management conference in May 2006. The parties stipulated to continue the case management conference to October and the discovery cut-off to the end of December 2006.

The parties submitted to the Court several status reports regarding discovery issues, but were able to resolve them without intervention. They agreed that they could not complete discovery by the end of December 2006. The Court extended the discovery cut-off to May 31, 2007. In December, the Court set a further case management conference for April 2007 and ordered the parties to file any cross-motions for summary judgment by July 31, 2007.

In March 2007 Gordon and Rees substituted as counsel for Lafayette and Kumagai for all Defendants. At the case management conference in April 2007 the Court set a trial date of November 5, 2007 and ordered Plaintiff to file a motion for summary judgment by August 31. The discovery cut-off was extended to July 27. The parties had a number of

discovery disputes over the course of the summer, which the Court resolved.

In August the parties stipulated to the dismissal without prejudice of Plaintiff's First Claim for Relief for failure to accommodate Plaintiff's disability and Plaintiff's Third Claim for Relief for discrimination pursuant to 42 U.S.C. §1983 against Defendants Dwyer, Newmeyer and Ortiz. A settlement conference was held September 10, 2007 but the case did not settle at that time. Plaintiff filed this motion for summary judgment.

## Plaintiff's Motion

Plaintiff asks the Court to grant summary judgment on three propositions:

A. The University violated its duty to accommodate him;

B. The University's actions constitute "deliberate indifference" to Plaintiff's federally protected rights; and

C. Plaintiff is entitled to lost salary because the University's failure to accommodate him delayed his graduation and prevented him from obtaining employment as a lawyer.

## Standard for Summary Judgment

Where the party moving for summary judgment would bear the burden of proof at trial, in this case the plaintiff, he has the initial burden of producing evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

If the moving party does not satisfy his initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party does satisfy his initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Where the parties differ over the facts, the Court must take as established the fact version offered by the non-moving party to the extent supported by admissible non-conclusory evidence. The Court does not weigh the evidence or make credibility determinations. To these facts the Court may add any additional facts that are undisputed.

### Plaintiff's Position

Simonelli asks this Court to conclude that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law as to the University's liability under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), the Americans With Disabilities Act of 1990 ("ADA") (42 U.S.C. § 12101 et seq.) and the California Unruh Civil Rights Act (California Civil Code §§ 51, 52); the University's liability for compensatory damages, and damages against the University for lost employment in the amount of $202,500.

### Defendants' Position

The University Regents contend that they were not legally required to provide the specific accommodations Simonelli requested. Even if they were, that delays in providing these accommodations do not constitute a failure to accommodate. Defendants contend that Simonelli is not entitled to damages because Defendants did not intentionally discriminate against him and his alleged damages are speculative and not provable.

### Background: The ADA and Law Schools

Soon after the ADA was enacted, law students and new graduates began invoking its provisions in the classroom, the exam room and state bar examination testing centers. The University of Kansas Law School surveyed 80 law schools across the country in 1995. This study focused particular attention on the procedures in place, the specific accommodations the schools were providing, what documentation the student was typically required to provide, what types of disabilities were represented, what role faculty played in documenting and accommodating disabilities and what appeals processes were in place. Stone, Donald: *The Impact of the Americans with Disabilities Act on Legal Education and*

*Academic Modifications for Disabled Law Student: An Empirical Study*, 44 U. Kan. L. Rev. 567; 1995).

Another author examined the burden on disabled law students, specifically low-vision and blind students, of an already-rigorous course of study, and concluded that

> "[a]dvance planning (by both teacher and student) and regular communication are particularly important for the blind law student. The casebooks, supplementary materials, and a detailed syllabus should be made available as much as two months in advance so that the material may be processed into an accessible form. The law school may also provide readers for the student, and some computers can produce voiced, large-print, or brailled material. For the student who must rely on audiotaped or brailled casebooks, the classroom can be frustrating if the teacher uses the board or an overhead projection system without carefully explaining the content of the material. In addition, teachers should keep in mind that handouts will pose a problem for blind students, who will have to arrange to have them brailled or read aloud. And the teacher must be sure that the student receives sufficient notice of a canceled class or a changed assignment, whether by e-mail or some other means; that is especially important if the student needs to arrange for, or cancel, an interpreter."

Adams, Susan Johanne; *Leveling the Floor: Classroom Accommodations for Law Students with Disabilities,* 48 J. Legal Educ. 273, 281 -282 (1998).

In the case at bar, Simonelli distinguishes himself from blind students. Despite his low vision he is a visual learner for whom enlarged-text materials are the optimum accommodation.

## Analysis: Legal and Factual Issues

### A.    Legal Requirements Of Accommodation Under The Rehabilitation Act, ADA and the Unruh Act.

Title II of the ADA provides that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Hason v. Medical Board of California,* 279 F.3d 1167, 1171 (9th Cir. 2002). Section 504 of the Rehabilitation Act prohibits discrimination against persons with disabilities by recipients of federal financial assistance. *Douglas v. California Department of Youth Authority* (9 Cir. 2001) 271 F.3d 812, 819. Both these laws apply to disabled students in the University of California system, including its professional schools. *Wong v. Regents of the University of California,* 192 F.3d 807, 816 (9th Cir. 1999); *Zukle v. Regents of the University of California,*166 F.3d 1041, 1045-1046 (9th Cir. 1999). Under the

California Unruh Civil Rights Act (Civil Code § 51 et seq.), a violation of the ADA is also a violation of the Unruh Act (Civil Code § 51(f)): "A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section."

A public entity like the University of California is required to make modifications or accommodations to its programs to enable disabled students to participate in educational services. *Wong, supra*, 192 F.3d at 816 fn. 26; *Zukle, supra*, 166 F.3d at 1045 fn. 11. Applicable regulations flesh out the duty to accommodate students with disabilities. [1]

Federal regulations applicable to public entities under Title II of the ADA (issued by the Department of Justice) (28 C.F.R. Part 35) and by the Department of Education to implement the Rehabilitation Act (34 C.F.R. Part 104) specifically require public entities to make accommodations for disabled persons.

The ADA regulation (28 C.F.R. § 35.130(b)(7)) states:

> (7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

These regulations require public entities to provide necessary auxiliary aids and services to make communication with disabled persons as effective as communications with others and require that, in selecting the type of auxiliary aid or service to provide, the entity shall primary consideration to the requests of the individual with disabilities (28 C.F.R. § 35.160):

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
>
> (b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

---

[1] The Rehabilitation Act regulations applicable to education were issued by the Department of Education and are at 34 C.F.R. Part 104. ADA regulations were issued by the Department of Justice and are at 28 C.F.R. Part 35. The language quoted in the text is from the regulations in effect in 2002 when Newmeyer issued his letter of January 17, 2002.

> (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

The definition of "auxiliary aides and services" under the ADA regulations specifically includes "large print materials" (28 C.F.R. § 35.104):

> Auxiliary aids and services includes—[¶]
>
> (2) Qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments;

The Federal Regulations issued by the Department of Education to implement the Rehabilitation Act (34 C.F.R. Part 104) include specific regulations applicable to Postsecondary Education (34 C.F.R. Part 104, Subpart E) and Academic Adjustments for students with disabilities (34 C.F.R. § 104.44). Like the ADA regulations, the Rehabilitation Act regulations also require institutions to make academic adjustments for qualified handicapped students (34 C.F.R. § 104.44) and, in particular, to provide appropriate auxiliary aids to enable students to participate in their programs (34 C.F.R. § 104.44(d)):

> (d) Auxiliary aids.
>
> (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.
>
> (2) Auxiliary aids may include taped text, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use of study, or other devices or services of a personal nature.

Both the ADA and Rehabilitation Act regulations broadly define the prohibition against discrimination (28 C.F.R. § 35.130; 35 C.F.R. § 104.4). The ADA regulations provide, in particular, for equal opportunity to benefit from public services by requiring that the disabled individual must have the same opportunity to obtain the same result, to gain the same benefit and reach the same level of achievement as non-disabled persons (28 C.F.R. § 35.130):

>  (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability–
>
>> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>>
>> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
>
> (3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
>
>> (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or
>>
>> (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

The Rehabilitation Act regulations similarly require both equal opportunity and effective accommodations to enable disabled persons to gain the same benefit or achievement as nondisabled persons (34 C.F.R. § 104.4):

>  (b) Discriminatory actions prohibited. (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:
>
>> (I) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;
>>
>> (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>>
>> (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;
>>
>> (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.
>
> (2) For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical

result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

Finally, the ADA and Rehabilitation Act regulations require the adoption of grievance procedures "provid[ing] for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part." 28 C.F.R. § 35.107(b); see also 34 C.F.R. § 104.7(b).

**B.  Simonelli contends that the University violated its duty to accommodate him.**

**1.  Simonelli has the burden to show discrimination.**

Simonelli carries the burden at trial and on his motion for summary judgment of proving a violation of the ADA Title II, the Rehabilitation Act, and the Unruh Act. *Weinreich v. Los Angeles County Metropolitan Transp. Authority*, 114 F.3d 796, 798 (9th Cir. 1997); *Wong v. Regents*, 192 F.3d 807, 818 (9th Cir. 1999). To prove that a public program or service violated these acts, Simonelli must show: (1) he is a "qualified individual with a disability;" (2) he was either excluded from participation in or denied the benefit of a public entity's services, program, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) The prima facie standard for the Unruh Act, the ADA, and the Rehabilitation Act are "essentially coterminous." *Colombini v. Members of Bd. of Directors of Empire College Law School*, 2001 WL 1006785 (N.D.Cal.,2001).

**2.  Did the University evaluate the accommodations in light of Simonelli's medical condition?**

The parties stipulate that Simonelli is a qualified individual with a disability. They dispute whether he was discriminated against by the University by reason of his disability. Simonelli requested a specific accommodation: enlarged-text copies of his course materials, including textbooks, handouts and accompanying statutes and cases. The University claims it hesitated to provide the enlarged-text accommodation, even though Simonelli demanded it, because of concern for his vision. His own doctor, Dr. Creig Hoyt,

testified that Simonelli would experience fewer headaches and less eye pain if he refrained from reading as much as possible. Simonelli offers other statements in rebuttal, that his eye pain is not exacerbated by reading and furthermore that other technologies, such as braille or voice technology or readers, would not be appropriate, because he is not blind, and is a "visual learner." (Simonelli Reply Declaration at pages 2-5).

Simonelli in fact does not deny that the University gave him what he wanted, he just claims it was too late. The parties disagree substantially on the degree of lateness. The real question is whether Simonelli was effectively denied equal access to his law school education by the University's action or inaction.

### 3. Is an educational institution required to make a fundamental or substantial modification of its program?

The U.S. Supreme Court and the Ninth Circuit have ruled that in order to establish a violation of Title II of the ADA, a plaintiff must show a denial of "meaningful access." *Alexander v. Choate,* 469 U.S. 287, 301 (1985); *Hunsaker v Contra Costa County*, 149 F.3d 1041, 1043 (9th Cir. 1998). An educational institution is not required to make fundamental or substantial modifications to its program or standard; it need only make reasonable ones. *Alexander*, 469 U.S. at 300.

Defendants contend that educational institutions need not provide what the student demands, but are only required to make reasonable accommodations to ensure that the institution's requirements do not discriminate on the basis of a student's disability. See *Bennett-Nelson v. La. Bd. Of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) (holding that the existence of a violation of Title II or the Rehabilitation Act "depends on whether under both the Rehabilitation Act and the ADA, the demanded accommodation is in fact reasonable."); *Anderson v. Pennsylvania Dept. of Public Welfare*, 1 F.Supp. 2d 456, 466 (E.D.Pa. 1998) (holding that deference to the request of a disabled individual is desirable, but not required if there is another effective means of communication).

The issue of whether a particular accommodation is reasonable or an "effective means of communication" is generally a question of fact. *See Reynolds v. Brock*, 815 F.2d 571, 575 (9th Cir. 1987).

Simonelli opens his argument with the statement that "the undisputed facts show that the University failed to provide Simonelli large-text reading materials for his law school courses in a timely way." Simonelli then recites the commitment made by the University through Newmeyer and others and then reiterates that "the University simply did not provide these materials on a timely basis." Simonelli then discusses the nature of the accommodations offered, the distinction between "reasonable" accommodation in the context of an ADA employment case, versus an access case, such as the case here, and that the University has not shown an undue hardship on its operation due to the expense of accommodating Simonelli and that it has abandoned that defense.

Simonelli also argues about what the University must have done to satisfy the requirement for giving primary consideration to Simonelli's requests for accommodation.

None of these arguments deal with the very real dispute of facts over how much delay there was in providing Simonelli with enlarged-text materials, as his preferred form of accommodation for his low vision. The parties have a huge irreconcilable dispute on the timeliness of the University's accommodation of Simonelli. The University says "Simonelli received his enlarged materials a few days after the work had already been assigned in some of his classes from the fall 2000 semester to the fall 2002 semester." (DSS 36)(Def. Opp. at 2). Simonelli says "Until his last two years (Spring 2003 through Spring 2005), Simonelli did not receive all the enlarged-text materials for his courses until after the end of each semester and, on occasion, up to a year and a half after the end of the semester." (SSUMF No. 14)(Pltf. Mot. at 5).

The Joint Statement of Undisputed Facts says only: "Plaintiff received all of his course materials on time and in the correct format from the spring 2003 semester on. Simonelli Damages Decl. at ¶25, 27 and 31." The parties dispute the timeliness of the University's accommodations for Simonelli from 2000 to 2003.

On this basis Plaintiff's motion for summary judgment must be denied, due to the genuine dispute as to the significant material fact of the extent or existence of delay in the University's accommodation of Simonelli by providing enlarged-text materials, whether this constituted a failure to accommodate, and whether this caused the delay of his graduation.

**C.      Simonelli contends that the University's actions constitute "deliberate indifference" to his federally protected rights.**

        **1.      To recover damages under the ADA, Simonelli must show intentional discrimination or deliberate indifference.**

To recover monetary damages under the public services and programs provision of the Americans with Disabilities Act, a plaintiff must prove intentional discrimination on a defendant's part. Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. §12132. *Duvall v. County of Kitsap*, 260 F.3d 1124,1138 (9th Cir. 2001). A plaintiff may show intentional discrimination by demonstrating a defendant's deliberate indifference. Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood, *Id.* at 1139, *citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989).

To satisfy the first prong of the deliberate indifference test, a plaintiff must identify "specific reasonable" and "necessary" accommodations that the defendant failed to provide. *Duvall, Id., citing Memmer v. Marin County Courts*, 169 F.3d 630 633 (9th Cir. 1999).

On receiving a request for accommodation, a public entity's duty is to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation. Such an investigation is adequate if the entity gathers sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary. *Id.* The results of the University's investigation are summarized in a letter to Simonelli's attorney dated January 17, 2002 from Ward Newmeyer, ADA/504 Compliance Officer. (Ex. 3 to Simonelli Declaration)

Furthermore, the Attorney General's regulations require the public entity to give primary consideration to the requests of the individual with disabilities when determining what type of auxiliary aid and service is necessary. 28 C.F.R. §35.160(b)(2). Accordingly, a public entity does not "act" by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable. *Duvall,* 260 F.3d at 1139

In order to meet the second prong of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness. Notice combined with failure to provide appropriate facilities may violate Title II. *Id.* at 1139-1140 (internal citations omitted)

Simonelli asserts the University's "deliberate indifference" to his need for accommodation as the basis for an award of compensatory damages. The Americans with Disabilities Act requires a showing of intentional discrimination to merit an award of money damages. Intent may be proven by showing deliberate indifference to the rights of the disabled individual. *Lovell v. Chandler*, 303 F.3d 1039, 1056-1057 (9th Cir. 2002); *Duvall v. County of Kinsap*, 260 F.2d 1124, 1138-1139 (9th Cir. 2001). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139.

Simonelli contends that the University ignored both his federally protected rights and the harm their denial would cause him. Simonelli's facts in support of this contention are disputed by the University, both as to the appropriate accommodations, given Simonelli's demonstrated needs, and when and whether the University provided those accommodations. The parties dispute whether enlarged-print texts were the most effective accommodation for Simonelli and when the enlarged-print texts were provided to him.

Again, Simonelli fails to show that there is no genuine dispute over the material facts regarding the University's response to his request for accommodation.

**2. Simonelli need not show intentional discrimination to receive an award of damages for violation of the Unruh Act premised on a violation of the ADA.**

Simonelli does not need to show intentional discrimination to receive damages if he prevails on a claim under California's Unruh Act, premised on a violation of the ADA. As the Ninth Circuit ruled in the *Lentini* case:

> "[n]o showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation. This result is mandated by the plain meaning of the Unruh Act's language, which that a violation of the ADA is, *per se*, a violation of the Unruh Act. . . "Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts."

*Lentini v. California Center for the Arts,* 370 F.3d 837, 847 (9th Cir. 2004), citing *Presta v. Peninsula Corridor Joint Powers Board,* 16 F.Supp.2d 1134, 1135 (N.D.Cal.1998).

The court concluded:

"Therefore, we affirm the district court's conclusion that, insofar as the appellants violated the ADA, a showing of intentional discrimination was not required in order to award damages under the Unruh Act." *Lentini, Id.*

However, this still does not support granting Simonelli's motion for sumamry judgment, as he fails to show that there is no genuine issue of material fact in dispute that the University discriminated against him on the basis of his disability, whether intentionally or unintentionally.

**3.    Simonelli must show intentional discrimination to receive an award of damages for violation of the Unruh Act, if the violation is not premised on a violation of the ADA.**

If Simonelli fails to prove an ADA violation, he may still proceed on his Unruh Act claim, but must show intentional discrimination to receive an award of damages, because the claim would no longer be predicated on an ADA claim, and therefore would be subject to California law, as articulated in the case of *Harris v. Capital Growth Investors XIV,* 52 Cal.3d 1142, 1175 (1991), rather than the federal law described in *Lentini. See National Federation of the Blind v. Target Corporation,* C-06-1802 MHP (N.D.Cal. October 2, 2007) (finding that the disabled plaintiff's failure to satisfy the nexus requirement of the ADA did not necessarily defeat his state law claims, including a claim under the Unruh Act).

As discussed above, however, Simonelli fails to show that there is no genuine issue of material fact in dispute that the University discriminated against him, either intentionally or unintentionally, and therefore summary judgment must be denied.

**D.    Simonelli claims wages he lost because the University's failure to accommodate him delayed his graduation and prevented him from obtaining employment as a lawyer.**

The Court has denied summary judgment on the issue of liability. The question of liability will be decided by the jury, with damages for lost wages, as an equitable claim, being decided by the Court. Therefore, the Court denies the motion on the issue of lost wages as not yet ripe for decision. (See Order filed at Docket # 215):

> "Accordingly, the trial shall be bifurcated. Plaintiff's causes of action shall be tried by the jury, which will, if it finds liability, then calculate Plaintiff's damages for emotional distress, upset and suffering. The trial shall then proceed before the Court, without a jury, on Plaintiff's claim for lost wages as damages due to lost employment opportunities."

Plaintiff's motion for summary judgment on the grounds that the University violated its duty to accommodate him; that the University's actions constitute "deliberate indifference" to Plaintiff's federally protected rights; and that Plaintiff is entitled to lost salary because the University's failure to accommodate him delayed his graduation and prevented him from obtaining employment as a lawyer is denied.

IT IS SO ORDERED.

DATED: October 31, 2007

_____
James Larson
Chief Magistrate Judge

G:\JLALL\CHAMBERS\CASES\CIVIL\02-1107\ord-deny-156-final.wpd